## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ (JKS) |
| CyberSteward, Inc. d/b/a CYPFER Corp., | |
| Defendant. | |

### COMPLAINT

The PCT Litigation Trust ("PCT" or "Plaintiff")[2] established in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint (the "Complaint") against Defendant CyberSteward, Inc. d/b/a CYPFER Corp. ("CSI") (CSI and Prime are referred to as "Parties"), pursuant to sections 547 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), seeking to avoid and recover all preferential transfers of property made by the Debtors to or for the benefit of CSI plus interest, attorneys' fees, and costs. This Complaint is not a waiver of PCT's right to object to any claims CSI filed against the Debtors ("Claims") including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section

---

[1] The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2] The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

502"). Certain relief pursuant to Section 502 is sought by PCT in Count IV. PCT alleges as follows:

## INTRODUCTION

1. Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat. The Nevada Financial Institutions Division ("Nevada FID") shut down Prime on June 21, 2023 and Prime filed for bankruptcy shortly thereafter in August 2023. Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them. But, in a series of transactions from May 16, 2023 to June 20, 2023, Prime transferred $5,532,729.57 USD to CSI (the "Transfers"). CSI's Transfers were far outside of its ordinary course of business. Notably, on June 20, 2023, the day before Nevada FID shut Prime down, CSI received a series of repetitious transfers of $3,825,241.83, $179,462.14, $500,000, and $900,000, which left less than $24,000 in CSI's Prime account. Accordingly, all of the Transfers are preference payments which must be returned to Prime.

2. Plaintiff brings this adversary proceeding (the "Adversary Proceeding") under sections 547 and 550 of the Bankruptcy Code to avoid and recover all transfers of property and all obligations of Prime to or for the benefit CSI, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases.[3] These transfers are preferential transfers and are avoidable under Section 547 of the Bankruptcy Code. Pursuant to Section 502(d) of the Bankruptcy Code, PCT seeks to disallow any and all claims filed or held by CSI in these Chapter 11 Cases unless and until CSI has relinquished to PCT all property owed to it.

---

[3] Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

3.      CSI is a cybersecurity consulting firm which helps businesses plan for and recover from cybersecurity breaches, cyber-extortion and ransomware attacks.  Part of CSI's business is facilitating ransomware payments in response to ransomware attacks.  Because CSI did not itself have the requisite federal money service business ("MSB") registration and state money transmitter licenses (each an "MTL") to make those payments for its customers, it used Prime as a payment processor and "payment rail" to facilitate payments.

4.      To effectuate these services, in June 2022, CSI's President and CEO Jason Kotler, then operating under the name "CYPFER Corp.", engaged Prime for payment rails, liquidity, settlement, and compliance services.

5.      The agreements that governed Prime and CSI's relationship during the Preference Period are:  (i) Prime Trust Order Form, effective June 15, 2022 (the "Order Form");[4] (ii) Prime Trust Master Services Agreement, revision date August 30, 2022 (the "MSA");[5] (iii) Services Schedule for Prime Trust Custodial Services, revision date May 13, 2022 (the "Custodial Agreement");[6] and (iv) Service Schedule for Prime Trust API Services, revision date August 1, 2022 (the "API Agreement")[7] (collectively, the "Agreements").

6.      Although Prime was a Nevada state-chartered trust company, CSI never sought or received any trust or fiduciary services from Prime.  To the contrary, CSI engaged Prime to facilitate ransomware payments in both fiat and crypto for CSI.  CSI provided Prime with fiat and crypto and would later direct Prime to transfer assets to others or back to CSI.

---

[4]     A copy of the Order Form is attached as Exhibit A.

[5]     A copy of the MSA is attached as Exhibit B.

[6]     A copy of the Custodial Agreement is attached as Exhibit C.

[7]     A copy of the API Agreement is attached as Exhibit D.

7.      The MSA explicitly states that it "***does not create a . . . fiduciary or employment relationship between the parties.***"  Ex. B, MSA, § 14.1 (emphasis added).

8.      The Custodial Agreement provides that Prime was entitled to "***pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such [assets]. . . with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]***"  Ex. C, Custodial Agreement, § 2.7(b) (emphasis added).

9.      The Agreements establish that the Parties always maintained a strictly debtor-creditor relationship.

10.      The fiat that CSI transferred to Prime was held in commingled "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled the fiat CSI transferred to Prime with fiat from Prime's many other customers and Prime's own fiat generated from its business operations.

11.      Prime attempted to keep track of commingled fiat transferred by CSI (and other customers') with an internal, omnibus ledger (the "Internal Ledger").  But the Internal Ledger was errantly and later intentionally corrupted by Prime.

12.      Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat that CSI transferred to Prime.

13.      The third-party expert retained by Plaintiff in this matter, James P. Brennan, also has confirmed that it is impossible to identify or trace the fiat that CSI transferred to Prime from

fiat provided by Prime's other customers and Prime's own fiat.  *See* Declaration of James P. Brennan (the "Brennan Decl.").[8]

14.     Bank account statements confirm that the fiat transferred from Prime to CSI during the Preference Period was not the original fiat that CSI had transferred to Prime.  *See id*. at ¶ 81–83.  Rather, these transfers were fiat from the commingled, omnibus bank accounts.

15.     In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[9] holding more than 11,000 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id*. at ¶¶ 45–46.

16.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id*. at ¶¶ 47–52.

17.     Prime executives have admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("Liquidity Provider") who sold Prime the replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:

> Q:     When it says funds transfer. . . and it says "wire, wire, wire."  Do you see that?
>
> A:     Yes.

---

[8]     A copy of the Brennan Decl. is attached as Exhibit E.

[9]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f".

Q:      *There were no wire transfers; right*?

A:      *Yes*.

Q:      *Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?*

A:      *Yes, there were no wire transfers*.

Deposition of ▇▇▇▇▇▇▇, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "▇▇ Dep."), 164:22–165:10 (emphasis added).

18.     Prime's use of its fiat transferred by other customers to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled fiat from CSI, and other Prime customers.

19.     Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace fiat any specific deposits, withdrawals, or transfers that were made by any particular customer, including CSI.  *See id*. at ¶¶ 16, 43, 62, 83.

20.     Prime's Transfers to CSI during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

21.     Because the Parties' relationship was strictly a debtor-creditor relationship, the Transfers to CSI during the Preference Period must be returned to the Debtors' estate pursuant to Sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.

22.     During the course of this Adversary Proceeding, Plaintiff may learn (through formal discovery or otherwise) of additional transfers made to or obligations incurred by, CSI that are avoidable and/or recoverable under the Bankruptcy Code.  Plaintiff intends to avoid and/or

recover all such transfers and obligations made to or for the benefit of CSI and, accordingly, reserves the right to amend this Complaint.

## PARTIES

23.    Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").[10]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id*., § 1.118.

24.    Defendant CyberSteward, Inc. d/b/a CYPFER, Corp. is an Extra-Provincial Federal Corporation with Share with a registered address in Toronto, Canada.

## JURISDICTION AND VENUE

25.    The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the

---

[10]    *See* Docket No. 694.

fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor." *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust." *Id.*, §§ 12(s), (u).

26.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C.  § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

27.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Plaintiff confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

28.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

29.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

30.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens".  Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing

to pay.   Bitcoin and Ethereum are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies, including USD Coin and Tether.

31.     All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

32.     There are many different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

33.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

34.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a

digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

35.    Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

36.    Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

37.    A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

38.    A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method.  These types of physical hardware devices are provided by companies such as Trezor:



39.    Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still

be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to effectuate transactions in the crypto kept on the digital wallet.  Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

40.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.     Prime's Business Operations

41.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

42.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

43.     In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

44.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state MTL's required to conduct money transmission.

45.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service"—serving as an "on-and-off ramp" and "payment rail" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

46.     Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

47.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

## II.    CSI Engaged Prime for Payment Services and Not Trust or Fiduciary Services

48.     CSI is a cybersecurity consulting firm based in Toronto, Canada that helps businesses plan for and recover from cybersecurity breaches, cyber-extortion and ransomware attacks for clients located in the United States, United Kingdom, Canada, Caribbean, and Middle East.

| Describe your business model | CYPFER Corp. ("CYPFER") is a market-leading North American Cybersecurity consulting firm, based in Toronto, Canada, with technical expertise in helping businesses proactively plan for and recover from cybersecurity breaches, cyber-extortion and ransomware attacks. Providing advisory and project management and related services such as: proactive incident response planning, negotiations, remediation, settlement support, and emergency response consulting. CYPFER's seasoned expert team is razor-focused on helping organizations of all types and sizes plan for and if required, respond to cyber-attacks, by engaging with adversaries and helping clients investigate and recover from cyber-extortion and ransomware incidents. CYPFER works with many of the world's prominent insurance carriers, privacy and legal firms, and Fortune 1000 organizations. See attached "Business Overview" for a more detailed description. |
| --- | --- |

49.     As part of these services, CSI provides adversary and project management and related services including incident response planning, negotiations, remediation, settlement support, and emergency response consulting.  *See* https://cypfer.com/why-cypfer/.

50.     CSI typically accepts USD from its clients and converts the USD into crypto to make ransomware payments on behalf of its clients.

51.     To administer these services, CSI, then operating under the "CYPFER Corp." name, engaged Prime in June 2022 to provide liquidity, payment rails, and compliance services.

| **Flow of Funds** | |
|---|---|
| **Describe the flow of funds step by step** | Onboarded Client wires advisory fees and potential settlement amount funds in fiat to CYPFER (Prime Account). |
| | If required, CYPFER uses settlement amount funds to purchase required cryptocurrency from Prime Platform/OTC or CYPFER transfers to  Cryptocurrency Brokers. |
| | CYPFER using Prime or Broker transfers cryptocurrency digital assets to CYPFER's crypto wallet(s). |
| | CYPFER transfers digital assets to prescribed wallet. |
| | If there is no settlement, or if there are any residual funds, CYPFER refunds Client funds back to the Client's originating bank  account at end of each engagement. |

52.     Various regulators in the United States have stated that facilitating crypto and fiat ransomware payments is a form of "money transmission" that requires a federal MSB and state MTLs.

53.     For example, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") has issued guidance concerning "the sanctions risks associated with ransomware payments in connection with malicious cyber-enabled activities*." See Updated Advisory on Potential Sanctions Risk for Facilitating Ransomware Payments*, OFAC (Sep. 21, 2021), https://ofac.treasury.gov/media/912981/download?inline.

54.    Similarly, FinCEN issued guidance "to alert financial institutions of predominant trends, typologies, and potential indicators of ransomware and associated money laundering activities." *See Advisory on Ransomware and the Use of the Financial System to Facilitate Ransom Payments*, FinCEN Advisory No. FIN-2021-A004 (Nov. 8, 2021), https://www.fincen.gov/sites/default/files/advisory/2021-11-08/FinCEN%20Ransomware%20 Advisory_FINAL_508_.pdf.

55.    Specifically, FinCEN warns that "facilitat[ing] ransomware payments to cybercriminals, often by directly receiving customers' fiat funds, exchanging them for [crypto] and then transferring the [crypto] to criminal-controlled accounts . . . could constitute money transmission." *Id*. at 4.  As such, FinCEN advises that "[e]ntities engaged in" such activities "are required to register as an MSB with FinCEN, and are subject to [Bank Secrecy Act] obligations, ncluding filing [Suspicious Activity Reports]." *Id*.

56.    FinCEN also states that it "will not hesitate to take action against entities and individuals engaged in money transmission or other MSB activities if they fail to register with FinCEN or comply with their AML obligations" in connection with the facilitation of ransomware payments.  *Id*.

57.    During the relevant time periods, CSI was not a registered MSB with FinCEN. However, CSI understood that, as an MSB, its business was subject to registration and compliance requirements in the United States, as is reflected in the below April 6, 2022 email:

**From:** Jason Kotler | CYPFER.
**Sent:** April 6, 2022 9:12 AM
**To:** ████████████@primetrust.com>
**Subject:** RE: Introduction - Jor & Jason @CYPFER

Hi ████

*It's a pleasure to meet you. Amber is an awesome connector!*

By way of background, a couple of years ago I founded CYPFER, a leading cybersecurity firm offering a very critical cyber-attack incident response service, including cyber-extortion and ransomware advisory, negotiations and if/as required, cyber settlements (CYPFER.com).

I would love your expert guidance on best navigating and sourcing US commercial banking alternatives, given the global nature of our business, evolving KYC-AML-Compliance requirements, and that we are an MSB, registered with FINTRAC in Canada.

Would really appreciate your insights and assistance. Let me know your availability over the next couple of days for a call.

Many thanks,

J@son

58.     While CSI obtained an MSB registration in Canada, it did not do so for its activities in the United States. CSI needed Prime to facilitate transactions because CSI itself did not obtain or maintain federal MSB registrations or state MTLs.

59.     More specifically, CSI could facilitate its ransomware payments through Prime— *i.e.*, engage in U.S. money transmission—avoiding the need to incur the costs or be subjected to the scrutiny and oversight attendant to CSI obtaining its own state and federal licenses.

60.     Prime's exclusive role as a service provider to CSI was to accept assets transferred to it from CSI, to make payments to third parties upon CSI's request, and, if CSI did not request such payments, then Prime would owe CSI the fiat that CSI had provided to Prime.

61.     CSI did not engage Prime for any fiduciary or trust services.

### III.     The Agreements Make Clear that the Parties' Relationship was Strictly a Debtor-Creditor Relationship

62.     The Agreements governed the Parties' relationship during the Preference Period.

63.     At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law. *See* Ex. B, MSA, § 13.1 ("The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

64.     Prime and CSI executed the Order Form in June 2022. *See* Ex. A, Order Form.

65.     The Order Form specifically incorporates both the MSA and the Custodial Agreement by reference. *Id.* ("This Order Form is governed by the Prime Trust Master Services Agreement set forth at: https://www.primetrust.com/legal/msa, the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form (located at: https://www.primetrust.com/legal/msa-service-schedules), and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference.").

66.     The Order Form states that the "[MSA] and any of its incorporated documents, including the Service Schedule(s). . . shall supersede and replace any prior agreement(s) that may be in place between [CSI] and Prime Trust with respect to Prime Trust's services." Ex. A, Order Form.

67.     The Agreements make clear that the Parties had a strictly debtor-creditor relationship.

68.     The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and CSI.

69.     The MSA explicitly states: "The Parties are independent contractors.  The Agreement does ***not create a partnership, franchise, joint venture, agency, fiduciary or***

-16-

*employment relationship between the parties*" and that "***nothing in the Agreement, express or implied is intended to give rise to any third-party beneficiary***." <u>Ex. B</u>, MSA, § 14.1 (emphasis added).

70.     Prime, pursuant to the Custodial Agreement, also had complete discretion to invest, rehypothecate, hold and register in its own name, and otherwise transfer or use the assets provided by CSI to Prime as well as retain the profits derived from the assets that CSI transferred to Prime.

71.     For example, the Custodial Agreement permitted Prime to:

[O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]

<u>Ex. C</u>, Custodial Agreement, § 2.7(b).

72.     The Custodial Agreement also provided that CSI expressly agreed "that any such earnings, income, or compensation shall be retained by Prime Trust, and no portion of any such earning, income, or compensation shall be paid to or for customer . . ." *Id.*

73.     The Parties' operative Agreements make clear that the relationship between Prime and CSI was, at all relevant times, strictly a debtor-creditor relationship.

**IV.     Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name**

74.     The fiat that CSI and other customers transferred to Prime was not segregated into separate bank accounts. *See* <u>Ex. E</u>, Brennan Decl., ¶ 16. Instead, the fiat was held in omnibus bank accounts in Prime's name containing fiat other customers transferred to Prime and fiat that Prime generated from its own business operations. *See id.*

75.     Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), and Royal Business Bank ("RBB"). *See id.* at ¶ 12.

76.     The Transfers to CSI from Prime during the Preference Period were transferred from one of Prime's accounts at BMO.  *See id*. at ¶ 30; *see also* Ex. F, Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Agreement").[11]

77.     The BMO Agreement specifically provides that it "***is not for the benefit of any other person and no other person shall have any rights against [Prime] or [BMO Harris] hereunder.***"  *See* Ex. F, BMO Agreement, § 15(e) (emphasis added).

78.     The BMO Agreement does not state that the fiat was held "in trust for" or "for the benefit of" any party other than Prime.  *See* Ex. F, BMO Agreement.

79.     Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided."  *See* Ex. G, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A (the "BMO Certification").[12]

80.     Prime regularly transferred fiat between its various bank accounts, further commingling funds. *See* Ex. E, Brennan Decl., ¶¶ 20–30.

81.     For example, Prime used BMO x3077 primarily to make wire transfers. *See id.* at ¶ 22.

---

[11]    A copy of the BMO Agreement is attached as Exhibit F.

[12]    A copy of the BMO Certification is attached as Exhibit G.

82.     BMO x3077 held commingled funds that it regularly received from other Prime bank accounts and from Prime customers.  *See id.* at ¶¶ 21–26.

83.     At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[13]  *See id.* at ¶¶ 23–24.

84.     The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id.* at ¶ 24.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds.  *See id.* at ¶¶ 23–24.

85.     In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature.  *See id.* at ¶ 24.

86.     Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.  *See id.* at ¶¶ 19, 24.

87.     Prime typically made transfers between its bank accounts in round numbers, without reference to any specific transactions.  *See id.* at ¶ 28.  This suggests that Prime simply moved funds between its internal bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *Id*.

88.     Prime would also transfer funds between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers.  *See id.* at ¶ 18.

---

[13]     BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion."  *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit H, § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements).  *See* Ex. G, BMO Certification.

89.    Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger.  *See id.* at ¶¶ 16–19.

90.    However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Internal Ledger extremely difficult.  *See id.* at ¶ 28.

91.    ████████████ ("█████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

> Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

> A:    I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "█████ Dep."), 89: 19–25.

92.    Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  *See* <u>Ex. E</u>, Brennan Decl., ¶¶ 31–43.  This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.  *Id.*

93.    Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual.  *See id.* at ¶¶ 31, 33–48.

94.    Former Prime employees testified that Prime commingled fiat transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

95.   ████ testified that "[r]econciliations were not being done in a timely manner." ████ Dep., 38: 23–24.

96.   ████████████ ("████"), Prime's former Chief Financial Officer, testified:

Q:   Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:   I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

97.   ████ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.*, 213:15–22.

98.   ████████████ ("████"), Prime's former Senior Vice President of Operations and Reconciliations, also testified about Prime's reconciliations processes both before and after March 2021:

Q:   When you say it was a problem, what do you mean?

A:   There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

████ Dep., 19:23–20:5.

99.   ████ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

## 2    Finding and Response Summary Matrix

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|---|---|---|---|---|---|---|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

100.    Thus, Prime's repeated transfers of funds between omnibus bank accounts and Prime's failure to maintain proper tracking and reconciliation processes further exacerbated the commingling of fiat transferred to Prime by CSI with fiat transferred to Prime by Prime's other customers and fiat generated from Prime's own business operations. *See* Ex. E, Brennan Decl., ¶¶ 17–26, 33–38.

## V.    The 98f Wallet

101.    In December 2021, Plutus Financial Inc. d/b/a Abra ("Abra"), one of Prime's largest customers, requested a transfer of 5,867.71 ETH (worth approximately $24,000,000.00 at the time) from Prime. *See id.* at ¶ 45–46.  Subsequently, between December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000.00 at the time). *See id.* at ¶ 49.

102.    In attempting to satisfy Abra's transfer request, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:

> ▓▓@primetrust.com
> 2021-12-22 07:16:57.000 PM
> Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @▓▓ and @▓▓ ▓▓ are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

103.    Further investigation revealed that, for approximately eight months, Prime had been permitting Abra to transfer significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

104.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (approximately $45,000,000.00 at the time) to the 98f Wallet. *See* Ex. E, Brennan Decl., ¶ 46.

105.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet. *See id.* at ¶ 45.

106.    It was unclear to those at the company who the signers for the 98f Wallet were or how Prime could access the 98f Wallet. *See* ▓▓ Dep., 69:17–71:22. Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See* ▓▓ Dep., 181:6–8. Prime also did not possess and could not locate the passwords, which are called "seed phrases," that were associated with these physical hardware devices. *See id.*

107.    As such, Prime had no way of accessing the 98f Wallet. The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

108.    Prime was concerned about the negative impacts and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

109.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Abra's transfer requests as reflected below.  See Ex. E, Brennan Decl., ¶ 47.

110.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider to attempt to satisfy Abra's withdrawal requests as reflected in the chart below.  See id. at ¶ 49.

| Date | USD Internal Ledger "Wire" Transfer[14] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250 |
| 1/6/2022 | $2,778,400 | 800 |
| 1/6/2022 | $7,293,300 | 2,100 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000 |
| 3/29/2022 | $7,902,800 | 2,300 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

111.    The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat transferred to Prime from Prime's customers.  See id. at ¶¶ 50–52.

---

[14]    Prime did not actually execute any of these wire transfers. See ███ Dep, 164:22–165:10.

112.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, ███████:

Q:    So [Customer's] depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?

A:    I would defer to ███ on that.  But essentially it was use of omnibus funds, is my understanding.

Q:    What's use of omnibus funds?

A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.

Q:    And which funds were used to make the purchases of the ETH to fund the transactions?

A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding.  Once again, ███ would know specifically.

Deposition of ███████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

113.    The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.  *See* Ex. E, Brennan Decl., ¶ 52.  Thus, it is "indisputable" that the ETH that Prime transferred to Abra to satisfy its withdrawal requests could not be the same ETH that Abra had originally transferred to Prime.  *See id.*

## VI.    Prime Ultimately Corrupted and Falsified its Ledger to Hide Its Actions with Respect to the 98f Wallet

114.    Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Customer's withdrawal requests related to the 98f Wallet.  *See id.* at ¶ 53.

115.    Prime executives discussed how to hide these transactions from auditors at Nevada

FID:



116.    ██ confirmed in his deposition that Prime executives intentionally chose to settle

and record the purchases of ETH from Liquidity Provider on Prime's Internal Ledger as opposed

to externally transferring funds to Liquidity Provider.  *See* ██ Dep., 153:8–13.

117.    Specifically, Prime settled its ETH purchases from Liquidity Provider by

"credit[ing]" Liquidity Provider's customer balance at Prime with fiat amounts equivalent to each

ETH purchase.  *See id*. at 204:16–21.  To "credit" Liquidity Provider's fiat balance with Prime,

Prime had to input a "contribution" on its Ledger to make it appear as if Liquidity Provider had

wired fiat to Prime.  *See id.* at 155:11–156:9.  In reality, no funds were moving from one account to another in connection with the ETH purchases.

118.     ▇     testified:

A:     So let me—let me make sure I understand what you said.  You said how to get money to [Customer].  You meant how to get money to [Liquidity Provider]; right?

A:     Sorry, yeah, that's what I meant.  [Liquidity Provider].

Q:     Okay.  So in order to credit [Liquidity Provider]'s cash account at Prime, there needed to be a contribution on the internal [l]edger; is that right?

A:     Correct.

Q:     And once there is a contribution to the internal [l]edger, then when [Liquidity Provider] goes to its account, it looks like there is more cash in the account; isn't that right?

A:     Correct.

Q:     There's not actually any more cash in the bank account; right?

A:     No, there is no—there is no credit of that money to the bank accounts, only to the [l]edger.

*Id.*

119.     These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its bank accounts.  *See id.*

▇@primetrust.com

2021-12-23 03:40:01.000 AM

If we don't credit our ledger to settle, our bank account is plus the difference compared to the bank

▇@primetrust.com

2021-12-23 03:42:16.000 AM

The difference is are we okay with inflating our ledger vs having our bank account be out the difference compared to our ledger

▇@primetrust.com

2021-12-23 03:44:15.000 AM

Whatever you think is easier to reconcile once we get access to the locked ETH

120.    ████ further testified about Prime's "inflat[ed]" Internal Ledger compared to the

fiat in Prime's omnibus bank accounts:

Q:    [T]here's going to be cash reflected in [Liquidity Provider]'s account, but
that cash is not actually in the bank; is that right?

A:    Correct.  Correct.

Q:    And the cash that [Liquidity Provider] would have had, if they were to
withdraw, that's just in the omnibus cash account, that has everybody
else's—all other customers' cash in it, too; right?

A:    Correct . . .

Q:    I see.  But the [l]edger would show an amount owed to your customers that's
higher than the amount that you're holding in your bank?

A:    Exactly.

Q:    That's ultimately what happened; right?

A:    Yeah, that's exactly what happened.

████ Dep., 144:11–20; 146:7–15.

121.    ████ explained that Prime chose to record its purchases of ETH from Liquidity

Provider to satisfy Abra's transfer requests of on Prime's Ledger because that approach made it

easier for Prime to avoid detection from Nevada FID:

Q:    And FID is Nevada Financial Institution Division; right?

A:    I think so.  Yeah.

Q:    And so, what is ████ talking about when he's saying "minimizing FID
scrutiny during audit time"?

A:    It wasn't a—I think what he's saying is, you know, when FID comes to do
their regular—regulatory reviews with us, you know, how do—how do they
get around—or not get around, but how do they minimize, you know, the
scrutiny that FID would come down on Prime Trust for doing this.

Q:    So ████ saying, it sounds like, it would be easier to hide it from FID if
we do it internally as opposed to externally; is that right?

A:        That's—that's what he was trying to do, yeah.

███ Dep. 152:18–153:13.

122.    Prime executives seem to have undertaken efforts to make Internal Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider. *See* Ex. E, Brennan Decl., ¶¶ 47–49.

123.    As demonstrated in the illustrative chart below,[15] Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ███████████████0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ███████████████0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ███████████████b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ███████████████5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ███████████████6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ███████████████777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ███████████████2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ███████████████1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ███████████████113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ███████████████ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

124.    Prime's bank account statements do not reflect any of these wire transfers because they did not actually occur.[16] *See id.* at ¶¶ 59–61.

---

[15]    This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

[16]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as Exhibit I.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as Exhibit J.

125.    Prime's Internal Ledger shows incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000.00 on December 23, 2021, and $12,158,250.00 on December 31, 2021.  *See id.* at ¶ 58.

126.    These transfers correspond exactly with the value of the first two ETH purchases that occurred on these two days.  *Id.*

127.    However, these incoming wire transfers are not recorded in Prime's bank account statement for December 2021.  *See id.* at ¶ 60.

128.    The reason for this is simple: these incoming wire transfers never occurred and instead were manufactured by Prime to conceal its use of customer-transferred, commingled fiat to fund the purchases of ETH from Liquidity Provider to satisfy Abra's transfer requests.

129.    These false accounting entries were confirmed by ███ who also recognized that Prime's bank account statements would not reflect incoming wire transfers shown on Prime's Internal Ledger:

> Q:    When it says funds transfer in column F and it says "wire, wire, wire."  Do you see that?
>
> A:    Yes.
>
> Q:    There were no wire transfers; right?
>
> A:    Yes.
>
> Q:    Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?
>
> A:    Yes, there were no wire transfers.
>
> . . .
>
> Q:    And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?

A:      Correct.

Q:      And that's because there were no wire transfers out to [Liquidity Provider] in connection with these transactions; right?

A:      No wire transfers in.

████ Dep., 164:22–165:10; 166:5–15.

130.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations.  *See* Ex. E, Brennan Decl., ¶ 62.

## VII.   CSI Cannot Trace the Fiat It Transferred to Prime

131.    Prime held fiat transferred to it from customers in an omnibus, commingled manner.  *See id.* at ¶¶ 16–29.  This approach resulted in Prime's own employees being incapable of determining where any fiat transferred by a particular customer were located, as ████ testified:

Q:      And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:      It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:      And what does that mean to you, a client to have an omnibus account?

A:      It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:      And that was done at Prime Trust?

A:    It was done at Prime Trust.  It wasn't done very frequently, but there were—there were omnibus accounts at Prime Trust.

Q:    And do you know who was responsible for those accounts?

A:    I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

█████  Dep., 205:19–207:3.

132.    Another example of the confusion in tracing specific assets that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



On Sat, Dec 17, 2022 at 11:16 AM ████████ <████████@primetrust.com> wrote:

████

Do you know which banking account was used to see if we can determine what customer funds were utilized?

On Sat, Dec 17, 2022 at 2:12 PM ████████ <████████@primetrust.com> wrote:

All:
Yesterday I received another follow-up request from the NV FID and I'm requesting your assistance in preparing the response. ████████ is out of the office for a couple weeks so please send responses to me and cc him.

I have added names of the PT folks who I think are best suited to provide the information. If you think otherwise, please forward this request to the proper person and cc me and ████

1.  Regarding the User Agreement stated in the October 14, 2022 letter to the NFID, is this a disclosure on the website only or does every client sign acknowledgement of the User Agreement terms and conditions? - ████████
2.  As stated in the letter, "the Company invested in additional Etherium using fiat currency from its omnibus accounts."  Please provide a list of clients impacted from the investment and which omnibus accounts were utilized. - ████
3.  With the formation of the Executive Committee at the August 2, 2022 Board meeting, please provide Executive Committee minutes from the first meeting up through the most readily available minutes up to November 30, 2022. - ████

Thanks for your help here.

████

--
████
General Counsel
Prime Trust LLC
408-430-9109
primetrust.com
☒

133.    ████ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

> On Mon, Dec 19, 2022 at 9:28 AM ████████ < ████ @primetrust.com> wrote:
>
> Hey ████,
> Bank account, as in where was the USD pulled to credit our ledger and eventually
> purchased the ETH on our ledger? If so, I don't believe any specific bank accounts
> were used, as management considered all funds tangible in our omnibus model. In their
> decision, no bank movements were needed/done before the credits were requested to
> the ledger.

134.    ████████, Prime's former SVP and Head of Banking and Trust Operations,

confirmed that Prime could not identify which customers provided which fiat and crypto and that

Prime was "*not able to specify what customer is out the funds due to our omnibus structure*":

> On Wed, Dec 28, 2022 at 10:56 AM ████████ < ████ @primetrust.com> wrote:
>
> ████, and I met today.  We are in agreement that we are not able to specify what
> customer is out the funds due to our omnibus structure.  Please let us know if we need to
> have another conversation to align how to position this with the FID.

(Emphasis added).

135.    Because of Prime's commingling of fiat and poor recordkeeping procedures, it is

impossible for Plaintiff, CSI, or anyone else to trace and specifically identify the fiat that CSI

originally had transferred to Prime.  *See* Ex. E, Brennan Decl., ¶¶ 16–62.

## VIII.   Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

136.    In the weeks leading up to the Petition Date, including during the Preference Period,

Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency

issues Prime was experiencing.

137.    At the same time, and again during the Preference Period, details about Prime's

deteriorating financial condition—including several revoked state licenses, a failed merger

attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

138.   On May 25, 2023, Prime's CEO met in person with Nevada FID during which Prime was told that they would likely be shut down in the near future.

139.   Prior to May 25, 2023, documentary evidence reflects that Prime's CEO had been relaying to other market participants Prime's bleak financial condition and the likelihood that Nevada FID would shut them down.

140.   During the lead up to the May 25, 2023 meeting with Nevada FID and shortly thereafter, in response to confirmed rumors of Prime's financial condition, many of the industry's largest market participants were demanding transfers from Prime.

141.   For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

142.   On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals."  *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023),           https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-

%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits.  *Id.*

143.  The next day, BitGo canceled its acquisition of Prime.  One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business."  *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/crypt-custody-firm-bitgo-cancels-prime-trust-acquisition/.

144.  On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court").  *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.  The Nevada FID Petition directed Prime to cease and desist all retail trust activities.  *Id.*

145.  The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

146.  Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***."  *Id.* at 6 (emphasis added).

147. The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10. Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

148. On July 14, 2023, the Nevada Court placed Prime under receivership.

149. On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## IX.  Transfers From Prime to CSI During the Preference Period Are Avoidable

150. Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

151. First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

152. Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

153. Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

154. Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition. *See* 11 U.S.C. § 547(b)(4).

155. Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made. *See* 11 U.S.C. § 547(b)(5)(A)–(C).

-37-

156.    In the weeks leading up to Nevada FID's decision to shut down Prime, rumors about Prime's deteriorating financial condition and potential need to file for bankruptcy spready among certain players in the crypto industry.

157.    During this period of escalating financial distress, CSI exerted repeated pressure on Prime to transfer funds to CSI.

158.    For example, in communications directly preceding the Nevada FID decision, CSI's CEO, Jason Kotler sent a series of urgent communications to Prime explicitly requesting that Prime push wires to CSI on an "expedited basis":



| From: | Jason Kotler \| CYPFER.[jkotler@cypfer.ca] |
|---|---|
| Sent: | Sat 6/17/2023 8:15:13 PM (UTC+01:00) |
| To: | ▉▉▉@primetrust.com] |
| Cc: | ▉▉▉@primetrust.com]; Ed Dubrovsky[e.dubrovsky@cypfer.com] |
| Subject: | RE: CYPFER Corp, Prime Account - Urgent Trade Support |

**PRIVILEGED & CONFIDENTIAL**

Hi ▉▉▉

Thank you for the call this morning and your support on an expedited basis.

*Following up on the discussed action items:*

1.  Attaching the 3 wire transfers we would like you to request of your cash management team to expedite as soon as possible on Tuesday morning. We need these to settle some other trades ASAP we had to do on credit over the weekend.

2.  Please advise if the OTC trade desk can open earlier on Tues morning, and importantly if they can handle the $7M trade with the funds in our account, that we were trying to get done. If not, we will need to Prime-X to another broker, again on an expedited basis.

3.  Also, we really appreciate your offer to do email introductions for us to the 3 other OTC desks that may be able to handle our large and timely trades.

Cc'ing Ed, our COOm who set up our account. Please let us know if there are any other operational or banking items we may need to manage going forward for our team to be efficient and effective on the PrimeTrust platform.



159.    Mr. Kotler continued pressuring Prime to push outgoing wires shown as "pending,"

and to expedite the release of funds:

```
Comment ID: 16540802174363
Type: Comment
Author ID: 8659679946651
Public: True
Audit ID: 16540802174235
Via Channel: email
From Original Recipients: customersupport@primetrust.com, jkotler@cypfer.ca, legaladmin@cypfer.com
Created At: 6/20/2023 2:25:08 PM
From Address: legaladmin@cypfer.com
From Name: Legal & Admin | CYPFER
To Name: Support
To Address: customersupport@primetrust.zendesk.com
Attachments:
Subject: Outgoing Wire 1 of 4
Body: **PRIVILEGED & CONFIDENTIAL**


Good morning,


We have the following outgoing wire showing as "pending"; can you please expedite the release and
confirm once released so we can advise our recipient bank.

![picture containing text, screenshot, font

Description automatically
generated](https://support.primetrust.com/attachments/token/iRYVuZimouZ146yctkddZYhfS/?name=imag
e001.png)
```

160.    As a direct result of CSI's—and specifically Mr. Kotler's—pressure, Prime executed four wire transfers to CSI totaling $5,404,703.97

161.    Notably, Prime made these transfers totaling $5,404,703.97 on June 20, 2024, the day before Prime was shut down by Nevada FID, and this amount represented **97.7%** of the total Transfers that occurred during the Preference Period.

162.    After Nevada FID shut down, CSI continued demanding that Prime release funds to it, going so far as to state the CSI "put[s] Prime Trust on notice that [the funds] are not Prime Trust Funds, [] are the rightful property of the sender, and alternatively of CYPFER Corp. . . and they cannot be com[m]ingled or used by Prime Trust for any purpose whatsoever."

```
Comment ID: 1663313711 7083
Type: Comment
Author ID: 12996289037851
Public: True
Audit ID: 16633137116955
Via Channel: email
From Original Recipients: customersupport+id191472@primetrust.zendesk.com,
███████@primetrust.com, jkotler@cypfer.ca, ███@primetrust.com, legal@primetrust.com,
legaladmin@cypfer.com, ███@primetrust.com
Created At: 6/23/2023 5:58:16 PM
From Address: legaladmin@cypfer.com
From Name: Legal & Admin | CYPFER
To Name: Prime Trust- Customer Success
To Address: customersupport+id191472@primetrust.zendesk.com
Attachments:
Subject: Incoming Wire
Body: **WITHOUT PREDJUDICE**


‒ ‒

Dear, Prime Trust , Support,


**Please return and release these funds immediately to the sender. They were sent in error.**


We hereby put Prime Trust on notice that these are not Prime Trust funds, they are the rightful property of
the sender, and alternatively of CYPFER Corp. in trust for the sender, and they cannot be comingled or
used by Prime Trust for any purpose whatsoever.


**CYPFER CORP.**
```

163.    The fiat transactions between Prime and CSI during the Preference Period were notably different from prior transactions.  Prior to the Preference Period, from February 14, 2023 to May 15, 2023, the average dollar value of outgoing transactions was $188,228.73.  In stark contrast, during the Preference Period, the average dollar value of outgoing transactions was $553,272.96, representing a 193.9% increase when compared to the pre-Preference Period average:[17]

---

[17]    A copy of CSI's Outgoing API Data is attached as Exhibit K.

| ($ in actual USD) | | |
| --- | --- | --- |
| CYPFER Corp. - Preferential Transaction Summary | | |
| Date | Transaction Count | Preference Value ($) |
| 5/16/2023 | - | $ - |
| 5/17/2023 | 1 | $ (25,533.35) |
| 5/18/2023 | - | $ - |
| 5/19/2023 | - | $ - |
| 5/20/2023 | - | $ - |
| 5/21/2023 | - | $ - |
| 5/22/2023 | 1 | $ (7,575.70) |
| 5/23/2023 | - | $ - |
| 5/24/2023 | - | $ - |
| 5/25/2023 | - | $ - |
| 5/26/2023 | - | $ - |
| 5/27/2023 | - | $ - |
| 5/28/2023 | - | $ - |
| 5/29/2023 | - | $ - |
| 5/30/2023 | - | $ - |
| 5/31/2023 | - | $ - |
| 6/1/2023 | 1 | $ (982.95) |
| 6/2/2023 | - | $ - |
| 6/3/2023 | - | $ - |
| 6/4/2023 | - | $ - |
| 6/5/2023 | - | $ - |
| 6/6/2023 | 1 | $ (4,809.72) |
| 6/7/2023 | 1 | $ (83,722.43) |
| 6/8/2023 | - | $ - |
| 6/9/2023 | - | $ - |
| 6/10/2023 | - | $ - |
| 6/11/2023 | - | $ - |
| 6/12/2023 | - | $ - |
| 6/13/2023 | - | $ - |
| 6/14/2023 | - | $ - |
| 6/15/2023 | 1 | $ (5,401.45) |
| 6/16/2023 | - | $ - |
| 6/17/2023 | - | $ - |
| 6/18/2023 | - | $ - |
| 6/19/2023 | - | $ - |
| 6/20/2023 | 4 | $ (5,404,703.97) |
| 6/21/2023 | - | $ - |
| **Totals** | **10** | **$ (5,532,729.57)** |

*See* Ex. E, Brennan Decl., ¶ 66.

164.    Prime transferred $5,532,729.57 USD from Prime's BMO account to CSI during the Preference Period.  *See id.* at ¶ 67.

165.    The API log audit data establishes that Mr. Kotler—personally—and other CSI personnel, using the email addresses jkotler@cypfer.ca and legaladmin@cypfer.com, directed each of the Transfers.

| cash_transactions. created_date | cash_transactions.id | organization. label | account.number | cash_transactions. amount | incoming_or outgoing | activities.user_email | activities.user_name |
|---|---|---|---|---|---|---|---|
| 5/17/2023 | ███7d42 | CYPFER Corp. | ██8748 | (25,533.35) | Outgoing | legaladmin@cypfer.com | LegalAdmin |
| 5/22/2023 | ███480b | CYPFER Corp. | ██8748 | (7,575.70) | Outgoing | legaladmin@cypfer.com | LegalAdmin |
| 6/1/2023 | ███32c5 | CYPFER Corp. | ██8748 | (982.95) | Outgoing | legaladmin@cypfer.com | LegalAdmin |
| 6/6/2023 | ███b0d0 | CYPFER Corp. | ██8748 | (4,809.72) | Outgoing | legaladmin@cypfer.com | LegalAdmin |
| 6/7/2023 | ███1b49 | CYPFER Corp. | ██8748 | (83,722.43) | Outgoing | legaladmin@cypfer.com | LegalAdmin |
| 6/15/2023 | ███d2cc | CYPFER Corp. | ██8748 | (5,401.45) | Outgoing | legaladmin@cypfer.com | LegalAdmin |
| 6/20/2023 | ███0565 | CYPFER Corp. | ██8748 | (500,000.00) | Outgoing | jkotler@cypfer.ca | Jason Kotler |
| 6/20/2023 | ███7db6 | CYPFER Corp. | ██8748 | (900,000.00) | Outgoing | jkotler@cypfer.ca | Jason Kotler |
| 6/20/2023 | ███b76 | CYPFER Corp. | ██8748 | (3,825,241.83) | Outgoing | jkotler@cypfer.ca | Jason Kotler |
| 6/20/2023 | ███73d | CYPFER Corp. | ██8748 | (179,462.14) | Outgoing | legaladmin@cypfer.com | LegalAdmin |

*See id.* at ¶ 68; Ex. K.

166.    As previously alleged, the fiat in Prime's BMO x3077 account commingled fiat transferred to Prime by multiple Prime customers, including CSI.

167.    The Brennan Declaration examines a variety of deposits and withdrawals from this BMO account between June 16 and June 20, 2023, which reflects to extensive commingling at Prime. *See* Ex. E, Brennan Decl., ¶¶ 74–83.  In sum, the Brennan Declaration establishes that the funds CSI received during the preference period are not traceable to the funds that it initially provided to Prime.  For example, on June 16, 2023, the Internal Ledger reflects two incoming wires from CSI to Prime totaling $2,831,000.  *See id.* at ¶ 77.  On the same day, BMO x3077 recorded 56 incoming transfers and 91 outgoing transfers.  *Id.* at ¶ 75.  The beginning cash balance for BMO x3077 on June 16, 2023 was $638,436.23 and the ending cash balance was $295,980.74. This means that at least $2,535,019.26 of the $2,831,000 provided by CSI was transferred from BMO x3077 to other customers and Prime accounts the very same day.  *Id.* at ¶ 78.

168.    Looking further at June 20, 2023, the opening balance in BMO x3077 was $295,980.74.  This demonstrates that in order to satisfy the CSI June 20 withdrawal requests totaling $5,404,703.97, Prime required funds from other sources.  *Id.* at ¶ 82.

169.    Thus, the fiat transferred by Prime to CSI on June 20, 2023, was not only fiat that had been commingled with fiat transferred to Prime by other customers, but also included fiat that had been transferred to Prime by other customers.

170.    CSI's transactions in June 2023 illustrate that Prime commingled fiat in BMO x3077 from various internal and external sources (including CSI), on a daily or near-daily basis. Thus, all of the Fiat Transfers that Prime transferred to CSI from BMO x3077 during the Preference Period were commingled fiat. *See id.* at ¶¶ 82–83.

171.    The Transfers to CSI were transfers of an interest of Prime's property to or for the benefit of CSI during the Preference Period.

172.    Prime executed the Transfers during the Preference Period to satisfy the debt Prime owed to CSI under the Agreements.

173.    The Transfers were made while Prime was insolvent.  As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[18]  If not avoided, the Transfers will enable CSI to receive more than CSI would have received on account of their claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers in satisfaction of Prime's antecedent debt to CSI.  *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

174.    Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period performed by Plaintiff and the third-party expert retained in this matter, Plaintiff has determined that it may avoid many of the Transfers even after taking into account CSI's alleged affirmative defenses.[19]  Accordingly, certain of the Transfers to Defendant must be returned.  *See* 11 U.S.C. §§ 547(b), 550.

---

[18]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

[19]    It is CSI's obligation to establish all possible affirmative defenses, including subsequent new value.

175.    CSI transferred $128,025.60 of potential subsequent new value to Prime after receiving certain of the Transfers during the Preference Period.  *See* <u>Ex. E</u>, Brennan Decl., ¶ 69. Therefore, CSI's preference exposure is no less than $5,404,703.97.  *See id.*

176.    Additionally, we have evaluated CSI's fiat transaction activity.   The fiat transactions CSI executed prior to the preference period were markedly different in size, velocity, and volume.  During the preference period, outflows increased significantly, in a manner that was well outside CSI's ordinary course of business with Prime.

177.    During the course of this proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers made to CSI during the Preference Period.  It is Plaintiff's intention to avoid and recover all transfers made by Prime of an interest of Prime in property and to or for the benefit of CSI or any other transferee.  Plaintiff reserves its right to amend this original Complaint to include:  (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revision to CSI's name; (iv) additional Defendant; and/or (v) additional causes of action, if applicable (collectively, the "<u>Amendments</u>"), that may become known to Plaintiff at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfers,
### 11 U.S.C. § 547(b)

178.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

179.    The Transfers were made on account of a demand by CSI.

180.    Each of the Transfers was a transfer of an interest in property of Prime.

181.    Prime made the Transfers to or for the benefit of CSI.

182.    At the time of the Transfers, CSI was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code.  CSI received the Transfers, or, alternatively, the Transfers were made for CSI's benefit.

183.    Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

184.    Each of the Transfers was made within ninety days of the Petition Date

185.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.  If not avoided, the Transfers would enable CSI to receive more than CSI would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

186.    CSI has not repaid or returned any of the Transfers to Plaintiff.

187.    Pursuant to 11 U.S.C. § 547(b), Plaintiff has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that CSI could assert, including CSI's potential defenses under section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

188.    Accordingly, Plaintiff is entitled to recover from CSI not less $5,404,703.97 of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

**Count II**
**Recovery of Avoided Transfers from the Defendant,**
**11 U.S.C. § 550**

189.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

190.    Plaintiff is entitled to avoid preferential transfers described above pursuant to section 547(b) of the Bankruptcy Code.  CSI was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

191.    Accordingly, pursuant to section 550 of the Bankruptcy Code, Plaintiff is entitled to recover from CSI: not less than $5,404,703.97 of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

**Count III**
**Claim Objection, 11 U.S.C. § 502**

192.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

193.    CSI has filed a claims in these Chapter 11 Cases.

194.    As alleged above, CSI was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the persons for whose benefit the Transfers were made, and Plaintiff is entitled to avoid the Transfers described above pursuant to Section 547(b)

-47-

of the Bankruptcy Code, which are recoverable from CSI under Section 550 of the Bankruptcy Code.

195.     Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of CSI that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until CSI pays Plaintiff the value of the Transfers, for which and to the extent that the Court has determined CSI is liable pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

A.      Enter an order finding that the Transfers addressed herein are avoidable preferential transfers under 11 U.S.C. § 547;

B.      Award Plaintiff: (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers alleged herein, plus the value of any additional avoidable transfers that Plaintiff learns, through discovery or otherwise, were made to CSI;

C.      Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by CSI against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until CSI relinquishes to Plaintiff the amount ordered as an award for avoidable transfers;

D.      Award Plaintiff its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.      Grant Plaintiff all other relief, at law or equity, to which it may be entitled.

Dated:   June 27, 2025
           Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
dazman@mwe.com
jbevans@mwe.com
jpardo@mwe.com
ggriffith@mwe.com
pkennedy@mwe.com
jaminov@mwe.com
mduque@mwe.com

*Counsel to PCT Litigation Trust*